STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| In re: Village Associates Act 250 Land Use Permit | } | Docket No. 6-1-08 Vtec |
| (Appeal of Village Associates, LLC) | } | |
| | } | |

Decision and Order

Appellant Village Associates, LLC appealed from a decision of the District 4 Environmental Commission, granting Appellant's Act 250 permit for an affordable housing development, but requiring an off-site mitigation fee under 10 V.S.A. §§ 6086(a)(9)(B)(iv) and 6093. Appellant is represented by Heather R. Hammond, Esq.; and the Agency of Agriculture, Food and Markets is represented by Assistant Attorney General Diane E. Zamos, Esq.  The Land Use Panel of the Natural Resources Board has informational status through John H. Hasen, Esq. but did not file memoranda or otherwise participate in the merits of this appeal.

The project proceeded during the pendency of this litigation, as the only issue was whether or not an off-site mitigation fee would be required to be paid.  An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge.  A site visit was taken by Judge Wright alone, by agreement of the parties, including, at the request of the parties, driving to or past a number of area agricultural operations mentioned in evidence.  The parties were given the opportunity to submit written memoranda and requests for findings.  Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

1

Appellant-Applicant proposed[1] a multi-unit affordable housing development, to be known as Brookside Village, on the 25.8-acre parcel of property that is the subject of this appeal. The project was granted an Act 250 permit; the only issue in this appeal is whether the project site contains primary agricultural soils as defined in Act 250, 10 V.S.A. § 6001(15), which in turn governs whether the project must pay an off-site mitigation fee.[2] See 10 V.S.A. §§ 6086(a)(9)(B)(iv), 6093.

The roughly triangular property is located in the towns of Colchester and Winooski. It is bordered on its westerly side by the Winooski River and on its northerly side by Morehouse Brook. The long southeasterly side of the property has access to the surrounding street network via its frontage on a cul-de-sac turnaround at the end of West Street, a residential street in Winooski. A hammerhead turnaround ends near the property at the end of Hickok Street, another residential street one block north of West Street, but the project plans do not propose any access from the project property onto Hickok Street. West Street has access to Malletts Bay Avenue, the primary through street in the area, via Pine Street. Pine Street is relatively steep at its intersection with Malletts Bay Avenue.

In addition to the West Street access, the northeasterly corner of the property has two segments of frontage on Malletts Bay Avenue, from two existing residential lots that became part of the project property as a whole. The property has a total of approximately 300 feet of frontage onto Malletts Bay Avenue. The proposed project roadway to serve more than forty dwelling units will have access directly onto Malletts Bay Avenue via the longer, more easterly segment of that frontage; the project has a secondary access onto the West Street turnaround.

---

[1] The project and project property has since been transferred to Housing Vermont, which has not entered an appearance.

[2] The parties have also agreed as to the amount of that fee, if this decision concludes that it must be paid.

The parties do not dispute that 12.88 acres of the property contain soils that are classified on the Natural Resources Conservation Service soil maps as farmland of "statewide importance."[3]   The parties do not dispute that 2.03 acres of such soils are located so that they are unusable, and therefore do not constitute primary agricultural soils.  The parties agree that that 10.85 acres of the 12.88 acres of quality soils, on a plateau above the floodplain of the Winooski River, will be affected by the project.  That is, Applicant does not dispute the quality of the soils on the project property, their physical and chemical characteristics, or their soil map classifications.  Rather, Applicant disputes whether other factors, in particular the property's existing forest cover, surrounding land uses, and access issues, have already reduced its agricultural potential so that no mitigation fee should be required under 10 V.S.A. §§ 6086(a)(9)(B)(iv) and 6093.

The 10.85 acres of the project property now contains a healthy eastern woodland, including some stands of mature trees as well as regenerating eastern woodland of predominantly hardwood species.  The mature trees have value if harvested for timber; the dollar value of that timber was not established in evidence.  The regenerating forest and the stumps and slash from the mature trees would have value if harvested for wood chips to supply the nearby McNeil electric generating plant; the dollar value of the wood chips was not established in evidence.  There is no technical or physical impediment to the removal of trees from the 10.85-acre portion of the project property.

The 10.85 acres of the project property was farmed in the past, but is too small to house a livestock operation such as a dairy farm.  Daily or near-daily access to the property for milk trucks, manure spreaders, or large tractors via West Street through the adjacent residential neighborhood would be incompatible with the residential use of

---

[3]  To some extent, the soil map classifications themselves account for whether the soils are too rocky, too steep, or have too shallow a depth to bedrock, to be good agricultural soils.

3

that neighborhood. The 10.85 acres of the project property could be used to grow hay, or to grow vegetables and fruits, all of which require far less frequent access to the site for large machinery.

A working equine facility with an indoor riding ring is located on Malletts Bay Avenue in Colchester less than a mile north of the project property. A working dairy farm is located on Malletts Bay Avenue in Colchester approximately a mile-and-a-third north of the project property. The dairy farm works land on both sides of the road. A large successful diversified fruit and vegetable farming operation, including a retail farm store, is located in Colchester approximately 2½ miles north of the project property. A community garden, located less than half a mile to the south in downtown Winooski, is not a commercial agricultural operation.

Over the last four years, a small diversified vegetable farming operation in Shelburne has succeeded in two successive locations, farming on three to four-and-a-half acres, with the assistance of greenhouses and polyethylene tunnels or cold frames to extend the growing season. The farmer had previously run a similar small operation in Massachusetts that also included soft fruits such as blueberries and raspberries. The Shelburne farming operation is successful through a combination of retail sales at farmers' markets, specialty sales to restaurants, and sales of CSA (Community Supported Agriculture) shares, in which each member pays a share price in advance of the growing season and is entitled to a share of the produce each week during the growing season. Location close to a market created by the population of a relatively urban area contributes to the success of such a small agricultural operation, whether due to access to farmers' markets, or due to buyers' access to an on-site or nearby farm stand, pick-your-own operation, or CSA operation.

Similarly, vegetable farming is successful in Burlington's Intervale, across the Winooski River from the project property, even though the Intervale agricultural land is in the floodplain and precluded from having on-site structures. It is run as a

4

cooperative in which the participants share in the necessary agricultural machinery, greenhouse space, and other resources.

A small diversified specialty vegetable and soft fruit farming operation can therefore succeed in the Chittenden County metropolitan area, and could succeed on the 10.85-acre portion of the project property if that portion of the property were cleared of trees. If cleared, the 10.85-acre portion of the project property could also contribute to nearby agricultural operations if planted in hay or used for pasture.

> As defined in 10 V.S.A. § 6001(15), the term "primary agricultural soils" means:
>
> soil map units with the best combination of physical and chemical characteristics that have a potential for growing food, feed, and forage crops, have sufficient moisture and drainage, plant nutrients or responsiveness to fertilizers, few limitations for cultivation or limitations which may easily be overcome, and an average slope that does not exceed 15 percent. Present uses may be cropland, pasture, regenerating forests, forestland, or other agricultural or silvicultural uses. However, the soils must be of a size and location, relative to adjoining land uses, so that those soils will be capable, following removal of any identified limitations, of supporting or contributing to an economic or commercial agricultural operation. Unless contradicted by the qualifications stated in this subdivision, primary agricultural soils shall include important farmland soils map units with a rating of prime, statewide, or local importance as defined by the Natural Resources Conservation Service (N.R.C.S.) of the United States Department of Agriculture (U.S.D.A.).

If a project is proposed for primary agricultural soils, 10 V.S.A. § 6086(a)(9)(B) (criterion 9(B)) requires the applicant to demonstrate either that the project "will not result in any reduction in the agricultural potential of the primary agricultural soils," or that the project will comply with subsections (i) through (iv) of criterion 9(B). In the present case, the parties have entered into a mitigation agreement in compliance with subsections (i) through (iv), and with 10 V.S.A. § 6093, to take effect if the other prerequisites are met.

Thus, in the present case the Court must first determine whether the 10.85 acres of potentially primary agricultural soils have "few limitations for cultivation or limitations which may easily be overcome." 10 V.S.A. § 6001(15) (first sentence). If so, the Court must next determine whether the 10.85 acres of potentially primary agricultural soils are "of a size and location, relative to adjoining land uses, so that those soils will be capable, following removal of any identified limitations, of supporting or contributing to an economic or commercial agricultural operation." Id. (third sentence). If so, the project contains primary agricultural soils, and the remaining question is whether the applicant has demonstrated that the project "will not result in any reduction in the agricultural potential of the primary agricultural soils," under the first prong of 10 V.S.A. § 6086(a)(9)(B).

Ease of Overcoming Limitations to Cultivation

Applicant argues that the existing forest cover of the 10.85 acres of potential primary agricultural soils is a limitation for cultivation which cannot easily be overcome. However, under the present statute, the presence of mature or regenerating forest does not constitute the type of limitation for cultivation that would preclude soils from meeting the definition of "primary agricultural soils." Rather, the definition in 10 V.S.A. § 6001(15) was amended in 2006 to expressly include soils on which the present uses are "regenerating forests, forestland, or other . . . silvicultural uses," as well as to include soils at present in use for cropland, pasture, or other agricultural uses.

In interpreting statutes, the Court's primary goal is to give effect to the intent of the legislature, looking first to the plain language of the statute to determine that intent. State v. Stell, 2007 VT 106, ¶ 12, 182 Vt. 368. By its plain language, the definition of "primary agricultural soils" now includes soils (with the requisite physical and chemical characteristics as shown by the soils maps or by other soils testing) that are at present forested. It specifically includes soils covered by the type of regenerating forest

on the project site, as well as soils covered by mature forest, or by trees grown as a crop. This language was specifically added when 10 V.S.A. § 6001(15) was amended in 2006. 2005, No. 183 (Adj. Sess.), § 6. The clear statutory intent is now[4] to include, as potential primary agricultural soils, those soils that are forested at the time an application is submitted.

Applicant also argues that the cost of removing the trees on the site to convert it to agricultural use should be considered to be a limitation for cultivation which cannot be easily overcome. Applicant argues essentially that the cost of removing the trees on the site would not warrant their removal for the purpose of converting the property to an agricultural use, given the economic return of an agricultural operation, even though trees would also have to be removed for the proposed project.

Beyond the plain meaning of the statute as including soils with existing forest cover, the overall structure of the statutory treatment of primary agricultural soils shows that the cost of overcoming a limitation for cultivation was not intended to be considered in determining whether such a limitation may "easily" be overcome. See Wright v. Bradley, 2006 VT 100, ¶ 7, 180 Vt. 383 (citing In re Estate of Cote, 2004 VT 17, ¶ 10, 176 Vt. 293) (explaining that statutes should be interpreted as a whole in order to give effect to every part); In re Miller, 2009 VT 36, ¶ 14 (citing State v Brennan, 172 Vt. 277, 280 (2001)) (explaining that statutes should be interpreted to avoid surplusage).

Rather, the structure of § 6001(15) shows that the required analysis of the "ease" of overcoming a limitation must be intended to address the practical or technical difficulty of overcoming the limitation, such as whether waterlogged soils may be drained, or whether the existence of a gully prevents logging equipment from reaching the site, rather than the economics of removing it for agriculture as compared with

---

[4] Decisions of the former Environmental Board decided prior to the 2006 amendment are therefore inapposite.

7

removing it for development. The economic feasibility of an agricultural operation on the project site is instead addressed two sentences later in the same definition of primary agricultural soils, where the statute requires an analysis of an agricultural operation's economic feasibility "<u>following</u> removal of any identified limitations." 10 V.S.A. § 6001(15) (third sentence) (emphasis added).

If economic feasibility were to be considered in analyzing the "ease" of overcoming limitations, the remainder of § 6001(15) would instead become surplusage in most instances, which is a result the Court must avoid in interpreting statutes. <u>In re Miller</u>, 2009 VT 36, ¶ 14. That is, it would rarely, if ever, be as or more economically advantageous to clear heavily forested land for agriculture as compared with the immediate economic return of clearing it for development. Such an analysis would automatically exempt most forested agricultural soils from Criterion 9(B) analysis, contrary to the statutory intent. Rather, it harmonizes both the first and the third sentences of § 6001(15), together with Criterion 9(B), to first determine the practical or technical ease of overcoming the limitations on agriculture posed by the forest cover, and then to determine the economic potential for an agricultural operation following removal of any identified limitations. See <u>Wright v. Bradley</u>, 2006 VT 100, ¶ 7 (citing <u>In re Estate of Cote</u>, 2004 VT 17, ¶ 10).

Accordingly, the limitation posed by the forest cover for the use of the 10.85-acre portion of the project property for agriculture is a limitation that may easily be overcome.

<u>Capability of Supporting or Contributing to an Economic or Commercial Agricultural Operation</u>

Given the high quality for agriculture of the soils on the flat 10.85-acre portion of the project property, and their location close to a metropolitan area and also close to several commercial agricultural operations, the 10.85-acre portion of the project

property would be capable, following removal of the trees, of supporting a small diversified vegetable and soft fruit economic agricultural operation, or of contributing to the nearby commercial vegetable and soft fruit agricultural operation, or of contributing hay to the nearby economic or commercial equine or dairy agricultural operation. If the required agricultural machinery could not be kept in a structure on the property, it could be brought to the property as necessary for soil amendment,[5] planting, and harvesting, via either the Malletts Bay Avenue entrance or the West Street entrance to the property. Because agricultural machinery could enter the property from Malletts Bay Avenue and, even if it were to enter the property via West Street, would not have to do so frequently, the agricultural use of the property to raise vegetables, fruits, or hay, would not be incompatible with the adjacent residential neighborhood. The 10.85 acres of the project at issue in the present appeal therefore constitute primary agricultural soils.

Reduction of Agricultural Potential of Soils

The parties do not disagree that the project will result in the reduction of the agricultural potential of the 10.85 acres of those soils, under the first prong of 10 V.S.A. § 6086(a)(9)(B). Therefore the off-site mitigation payment is required to be paid.

---

[5] As the property would not support or be suitable for a livestock or dairy operation, the incompatibility of frequent manure management traffic or daily milk truck traffic with the adjacent residential neighborhood does not preclude the agricultural use of the property.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that the project will result in the reduction of the agricultural potential of 10.85 acres of primary agricultural soils, for which the already-agreed amount of off-site mitigation fee is required to be paid.

Done at Berlin, Vermont, this 30th day of April, 2009.

_____

Merideth Wright
Environmental Judge